UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Steve Ondo, et al.,** | ) | **CASE NO.  1:13 CV 762** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **City of Cleveland, et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

### Introduction

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 74) and defendants' Motion to Strike the Affidavits of Plaintiffs Steven Ondo and Jonathon Simcox (Doc. 81). This is a § 1983 case alleging excessive force and "undisguised prejudice" against two gay men by the City of Cleveland and its officers and agents.  For the following reasons, the motions are GRANTED.

### Facts

Plaintiffs Steven Ondo and Jonathon Simcox filed their Complaint against defendants City of Cleveland, Officer Clifford Kime, Officer Tintlenot, Officer Cavanaugh, Officer

1

Kean, Sergeant Elias Diaz, Officer Park, Officer Livingston, Officer Rojas, Officer Freeman, Officer Crytzer, Officer Johnson, Officer Sanchez, Officer Toomey, Corrections Officer Dennis Barack, Corrections Officer Rowell, and Corrections Officer Robinson. This is a re-filing of a Complaint filed by plaintiffs against the named defendants herein as well as six other defendants which were not re-named here. In the previous case, *Ondo, et al., v. City of Cleveland, et al.,* Case No.1:12 CV 122, a First Amended Complaint was filed.  After the Court issued a Memorandum of Opinion and Order granting the Motion to Dismiss filed by the City of Cleveland and Officer Clifford Kime, the plaintiffs dismissed the case without prejudice. This Complaint was filed approximately seven months later.  This Court previously dismissed, by Memorandum of Opinion and Order, defendants Cavanaugh, Tintlenot, Diaz, Kean, and City of Cleveland.  Defendant Kime was voluntarily dismissed.  Plaintiffs were given until October 15, 2013 to serve Barack and Sanchez, but failed to do so.  Accordingly, the remaining defendants are SWAT Team Officers Crytzer, Freeman, Johnson, Livingston, Park, Rojas, and Toomey and Corrections Officers Rowell and Robinson.

      Defendants present evidence to this Court establishing the following.  Plaintiffs' residence on West 108 Street was the first stop for the Cleveland Police Warrant Team on April 8, 2011 with officers arriving at 7:00 a.m. The arrest warrants for plaintiffs indicated that they were being arrested for felonious assault on a police officer. The SWAT Unit members of the team were supervised by Lieutenant Timothy Gaertner and Sergeant Galmarini, not defendants herein. The SWAT team arrived in two vans.  Plaintiffs' apartment was located on the third floor of a multi-unit structure.  Ten SWAT officers participated in the warrant sweep.  Officer Johnson loudly announced the "Cleveland Police" at the front door

2

which he found to be open. Johnson and other members of the team proceeded up the stairs. As some members of the team searched the second floor, which appeared to be vacant, Johnson covered the stairwell to the third floor. Shortly thereafter, Johnson observed one of the suspects on the arrest warrant come from the third floor to the stairwell. As the suspect gave his name of Ondo, Johnson recognized the name from the warrant. Johnson advised him that there was a warrant for his arrest. At that location, Ondo was handed over to Lt. Gaertner who handcuffed him and stayed with him the entire time that the officers looked for Simcox. Simcox then appeared on the stairs and Johnson likewise informed him of his arrest and handed him over to the officers that were waiting on the second floor. Sergeant Galmarini had both plaintiffs in a room on the second floor. They had already been handcuffed and were instructed to face the wall. Both were agitated and repeatedly questioned why they were being arrested. (Johnson, Gaertner, and Galmarini depo.)

SWAT officers Livingston, Crytzer, and Toomey, who had cleared the first floor apartment and proceeded to the second floor, observed both plaintiffs handcuffed as they walked through the second floor. As the officers were informed that the scene was cleared, they continued to walk past plaintiffs and out of the building. (Livingston depo.) SWAT officers Rojas, Park, and Freeman were in a second group who had secured the second floor apartment. They observed plaintiffs arrested, handcuffed, up against the wall, and apparently compliant as they walked through the second floor. Park observed that Lt. Gaertner and Sgt. Galmarini were with plaintiffs on the second floor. Galmarini informed Park that the house was secured and that Park was cleared to go and open the vans. (Park depo.)

At no time did Johnson hear any member of the SWAT team make a negative

3

reference to plaintiffs' sexual orientation. Johnson never slapped, smacked, pushed, or hit either plaintiff. (Johnson depo. 35-40) Neither Galmarini nor Gaertner heard any officer use a gay slur towards plaintiffs. (Galmarini depo. 29, Gaertner depo. 52) Park never struck Simcox twice in the face with his fists, never touched the plaintiffs, or saw any officer strike either plaintiff. (Park depo. 26, 39) Rojas never touched either plaintiff. (Rojas depo. 16)

Plaintiffs were received into the City jail at 8:10 a.m. that morning. (Doc. 74 Ex.2) Booking photographs were obtained of both plaintiffs who testified that they were wearing jail-issued black jump suits in the photos and that both plaintiffs received the jump suits at the same time. (Ondo depo. 40; Doc. 74 Exs. 3 and 4) Plaintiffs testified that they were wearing their jump suits when they were taken to the phone cell. (Simcox depo. 84-85) Plaintiffs signed the phone log at 8:40 a.m. on April 8, 2011. (Ondo. depo. 42, Ex. 1) Plaintiffs were transferred to the County jail. They were still wearing their black jump suits in the County jail and when released from there, wore them home. (Simcox depo. 90-91, Doc. 74 Exs. 5 and 6)

According to plaintiff Ondo's deposition testimony, he was awakened by all the screaming. As he approached the stairs, an officer grabbed him, passed him on to other officers who pulled him to the vacant second floor apartment. The officers did not identify themselves as police. He was forced into a wall and anytime he looked away, the officers hit him in the face and put him back into the wall. When asked how many times he was punched, Ondo responded, "One time I was actually punched with a closed fist." He was in the second floor apartment when he was punched and it happened before he was put up against the wall. After Simcox was brought into the second floor apartment, the gay slurs started. Things were

said such as, "faggot," "how can you live you life this way," and "disgusting people." (Ondo 12-21)

Simcox testified that he was awakened by the chaos and screaming and followed Ondo to the stairs where he saw the SWAT officers. He threw his hands into the air. He was punched twice in the face by an officer who grabbed him and took him to the second floor apartment. He was thrown against the wall where Ondo was also standing. The officers were laughing at plaintiffs and calling them "faggots" and other "homophobic slurs."(Simcox 34-43)

Jesse Simcox, Jonathon's brother, stayed at plaintiffs' apartment the night of April 7 as the three intended to report for work at a restaurant the morning of April 8. He awoke to commotion and yelling, plaintiff's dogs barking, and someone repeatedly yelling, "shut up." Simcox went down to the second floor unit to investigate. When he arrived on the second floor, he saw plaintiffs "pinned up" against the wall. As the dogs were barking, he picked one up and carried it upstairs. He had seen one of the officers kick one of the dogs. When he returned, plaintiffs were still against the wall. The situation looked "very abusive." At one point, he saw an officer "body slam" his brother into the wall. Simcox asked to see a warrant but the officers refused. When Simcox saw that the officers were taking plaintiffs, he asked if he could get pants for the plaintiffs, who were wearing their underwear. The officers told him, "Faggots don't wear pants in jail." The officers allowed shoes. (Jesse Simcox depo. 30-79)

According to Ondo, plaintiffs were brought handcuffed to their front yard where the officers were communicating with each other. When asked, "Do you remember anything

specifically that was said to you in the front yard?" He responded, "No. They laughed at us. They didn't say anything specifically to us, they were talking with each other when we were in the front yard. When we were outside they were talking to each other." (Ondo depo. 57-59) Simcox testified that plaintiffs were roughly transported to the front yard in handcuffs where he heard one officer say that it was "gross" that three of them were sleeping together- referring to Simcox's brother who was also in the apartment. (Simcox depo. 105-106)

Plaintiffs were taken to the jail in the transport van wearing only their shirts and underwear. One person arrested had been permitted to wait for his girlfriend to come to his house and lock it before he was transported in the vehicle. (Simcox depo. 110-111)

Plaintiffs both submitted affidavits with their brief. Simcox avers that after his deposition was taken, he attended the depositions of the defendant officers in October 2013. This was the first opportunity he had to see them in person and identify which officer did what on April 8. Consequently, he identified the following. Park grabbed him by the shirt, punched him in the face two times with a closed fist, and told him to shut up. Park dragged him down the stairs, took him to the vacant second floor apartment, and threw him up against the wall. Rojas smacked him in the face and told him to look at the wall. Crytzer was laughing as this was happening. Cavanaugh dragged him down the stairs and outside in his underwear. Johnson said, "Faggots don't wear pants to jail." All defendant officers participated in the degrading and humiliating acts, including the homophobic slurs, and did not attempt to stop Park or Rojas from hitting plaintiff. (Simcox aff.)

Ondo avers that after his deposition was taken, he attended the depositions of the defendant officers in October 2013. This was the first opportunity he had to see them in

6

person and identify which officer did what on April 8. Consequently, he identified the following. Park grabbed him, pulled him down the stairs, and slugged him in the face. Park then passed him down the line to another officer who put him in the vacant second floor apartment. Rojas slugged him in the center of his face with a closed fist. Rojas continued to hit him in the face every time he moved his head or tried to ask a question. Park screamed gay slurs and pushed his face into the wall. Cavanaugh dragged him down the stairs and outside in his underwear. Johnson said, "Faggots don't wear pants to jail." All defendant officers participated in the degrading and humiliating acts, including the homophobic slurs, and did not attempt to stop Park or Rojas from hitting plaintiff. (Ondo aff.)

As to whether the plaintiffs were resisting the officers and complying with orders, defendants testified the following. Galmarini did not observe plaintiffs to be physically resistant and did not receive any reports from the officers of plaintiffs being resistant. (Galmarini depo. 19) Gaertner did not recall plaintiffs being physically resistant. (Gaertner depo. 37) Johnson testified that after brief moments with both plaintiffs, they complied with his orders. (Johnson depo. 27) Freeman testified that plaintiffs appeared to him to be compliant. (Freeman depo. 17) Cavanaugh testified that plaintiffs appeared compliant and were not verbally resistant or aggressive. (Cavanaugh depo. 12) Tintelnot never witnessed either plaintiff acting in a way that was physically or verbally resistant. (Tintelnot depo. 27) From what Livingston saw, plaintiffs were compliant. (Livingston depo. 12) Park testified that plaintiffs appeared to be compliant. (Park depo. 14, 26) According to Rojas, plaintiffs appeared to be compliant. (Rojas depo. 17)

The Complaint alleges the following claims:  Count One alleges use of excessive

7

force by the Sweep Team (§ 1983), Count Two alleges violation of privacy by the Sweep Team and Corrections Officers (§ 1983), Count Three alleges failure to intervene and prevent continued violations of the Fourth Amendment by the Sweep Team (§ 1983), Count Four alleges violation of equal protection by the Sweep Team and Corrections Officers (§ 1983), Count Five alleges intentional infliction of emotional distress, and Count Six alleges invasion of privacy.

This matter is now before the Court upon defendants' Motion for Summary Judgment and Motion to Strike.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."

*Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**<u>Discussion</u>**

**(A)  Corrections Officers Rowell and Robinson**

Defendants assert that Corrections Officers Rowell and Robinson are entitled to summary judgment as plaintiffs' allegations that these defendants decided to house plaintiffs without pants, denied plaintiffs' requests for pants, and forced them to walk home without pants are unsupported by the evidence as discussed above.  Specifically, plaintiffs acknowledge that they were provided paper jump suits upon arrival at the City jail.  Plaintiffs

9

do not address or acknowledge the arguments regarding Rowell and Robinson and the Court finds that the undisputed evidence shows that these defendants are entitled to summary judgment.

### (B) SWAT Team Officers Crytzer, Freeman, Johnson, Livingston, Park, Rojas, and Toomey

#### (1) Section 1983 Claims

Section 1983 provides a cause of action to those deprived of a constitutional right by law enforcement officers acting under the color of state law. *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir.2000). Remaining defendants assert they are entitled to qualified immunity as to each of plaintiffs' federal claims. "Under that doctrine, government officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Schreiber v. Moe*, 596 F.3d 323 (6th Cir. 2010) (citing *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir.2009)). Thus, in determining the applicability of qualified immunity, a court first asks whether the officer's conduct violated a constitutional right. If no constitutional violation is found, "the inquiry stops, the § 1983 claim fails as a matter of law, and the officers do not need qualified immunity." *Williams v. Sandel*, 2011 WL 2790474 (6th Cir. July 13, 2011) (citations omitted). If a potential constitutional violation is found, the court asks "whether the right was clearly established in light of the specific circumstances of the case." *Id.*

#### (a) Excessive Force (Count One)

This Court, then, must determine whether a constitutional violation occurred. The Fourth Amendment prohibits the use of excessive force by arresting officers. *Meirthew v.*

10

*Amore*, 417 Fed.Appx. 494 (6th Cir. 2011) (citations omitted). The Sixth Circuit recently summarized the contours of a Fourth Amendment excessive force claim:

> 'A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred, and that the force used in effecting the seizure was objectively unreasonable.' *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir.2011). Whether a constitutional violation based on excessive force occurred 'depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight.' *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir.2007) (citing *Graham v. Connor*, 490 U.S. 386, 395–96 (1989)). In making its determination, the Court should 'pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' ' *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir.2010) (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir.2001)). This is not an 'exhaustive list,' and the inquiry ultimately turns on whether the seizure was reasonable under the 'totality of the circumstances.' *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008).

*Bozung v. Rawson*, 2011 WL 4634215 (6th Cir. Oct. 7, 2011). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. O'Connor*, 490 U.S. 386, 396–97 (1989).

Additionally, although this Court evaluates the decision to use force "from the perspective of an objective officer, the facts must still be viewed in a light most favorable to the plaintiff." *Id*. (citing *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008)).

"Qualified immunity is warranted even if a constitutional violation has occurred if the right violated was not clearly established." *Rodriguez v. City of Cleveland,* 2011 WL 3792371 (6th Cir. Aug. 26, 2011) (citations omitted). Thus, "to defeat qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had

11

been previously proscribed." *Meirthew,* 417 Fed.Appx. at 498.

Defendants assert that the unrefuted evidence shows that none of the defendants used any force in conjunction with plaintiffs' arrest and that plaintiffs cannot offer evidence that any of these defendants were involved in the alleged use of excessive force.  Defendants point out that they deny the use of force in their depositions and that the commanding officers confirmed that none of the officers used excessive force.

In response, plaintiffs assert, relying on their affidavits, that Park and Rojas used excessive force. Defendants have sought to strike the affidavits arguing that they are based upon belief and not personal knowledge. Plaintiffs contend that their affidavits are not based solely on belief but also personal knowledge.  For the following reasons, plaintiffs' averments as to the identity of the officers using excessive force must be stricken.

Both plaintiffs' affidavits provide that they "state the following on personal knowledge and belief."  However, "personal knowledge and belief" is not sufficient summary judgment evidence:

> To constitute evidence sufficient to support or oppose a motion for summary judgment, an affidavit 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.' Fed.R.Civ.P. 56(e)(1).[1] Totman verifies that his first amended complaint "is true and correct to the best of [his] knowledge and belief," which indicates that the allegations of the complaint go beyond Totman's personal knowledge and extend to matters within Totman's belief. His beliefs, however, do not meet the evidentiary standard set forth in Rule 56(e)(1) of the Federal Rules of Civil Procedure. *See Id.; see also Alpert v. United States*, 481 F.3d 404, 409 (6th Cir.2007) (holding that the affiant's "statement ... based upon his 'belief' ... did not demonstrate the personal knowledge required by Fed.R.Civ.P. 56(e)").

*Totman v. Louisville Jefferson County Metro Government,* 391 Fed. Appx. 454 (6th Cir. 2010).

---

[1]     This is now Fed.R.Civ.P. 56(c)(4).

Courts outside this Circuit have likewise concluded that a combination of personal knowledge and belief is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Harrison v. Culliver,* --- F.3d ----, 2014 WL 1304010 (11th Cir. 2014) (Averments that "to the best of his belief and knowledge" cannot create a genuine issue of fact because the statement shows that the affiant did not rely on his personal knowledge.); *Tara Productions, Inc. v. Hollywood Gadgets, Inc*., 449 Fed.Appx. 908 (11th Cir. 2011)(quoting *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir.2005). ("We have held that 'mere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a summary judgment motion.' ")

Even assuming it were proper to attest to facts based on personal knowledge and belief, plaintiffs fail to identify, and so the Court cannot discern, which assertions in the affidavits are based on personal knowledge and which are based on belief.

Therefore, because plaintiffs' affidavits are based on "personal knowledge and belief," they go beyond plaintiffs' personal knowledge "and extend to matters within plaintiffs' belief."  As such, they do not meet the evidentiary standard set forth in Rule 56 and must be stricken.

Additionally, defendants point out that plaintiffs' previous deposition testimony, answers to interrogatories, and Complaint establish that they could not identify any particular officers as the ones allegedly using force against them.

The Complaint alleges in relevant part:   "... a younger male officer in SWAT Gear with short, or slicked back, black hair punched Steven in the temple and pulled him down the stairs."  "As Jonathan approached as directed, one officer in SWAT Gear (wearing glasses,

13

either bald or with short-cropped hair, and an athletic build) confronted him and punched him multiple times in the head..."[2]  (¶ 49) "While Steven and Jonathan were held against the wall, at least three officers were close by. All wore SWAT Gear. One was a gray-haired older male with a moustache that barked questions at them and handled paperwork that was never shown to Steven, Jonathan or Jesse, despite repeated requests to see the warrant. Also present was an officer in SWAT Gear who appeared to be Hispanic, with tan skin and a mustache. This officer repeatedly struck Jonathan at the same time the officer with gray hair asked him and Steven questions." (¶¶ 55-56) "The final officer in SWAT Gear who was present was the bald, athletic one who was wearing glasses. He had previously confronted Jonathan on the stairs and punched him multiple times."  (¶ 57)  "Jonathan and Steven were unable to see which officers in SWAT Gear were responsible for repeatedly striking them." (¶ 59)

Thus, plaintiffs alleged that they were unable to see which officers actually struck them and they do not explain in their affidavits, other than stating that they saw them at depositions, how they were able to identify the specific officers.

At deposition, Ondo testified that he did not know who punched him but that he "was probably between 25 and 32, he was white, short hair, it was like a brownish color" and may have had glasses. (Ondo. depo. 16-18) Simcox testified that the officer who punched him was "a bigger guy" who had "glasses and a bald head." (Simcox depo. 35).

Other than stating that Park was the one referred to at deposition as wearing glasses and Rojas was the Hispanic one, the affidavits do not indicate that Park's and Rojas's

---

[2]  Defendants assert that neither description fits either Park or Rojas.  Park is neither bald nor wears glasses, and Rojas is Hispanic and is not white.  But, the Court cannot base its determination on defendants' statements in this regard.

appearance at their depositions was consistent with plaintiff's earlier descriptions at their own depositions.

Plaintiffs' answers to defendants' interrogatories regarding excessive force committed by Rojas and Park, completed on October 7, 2013, stated that "facts relevant to the plaintiff's claims that are responsive to this request are included in the Complaint." (Doc. 81 Exs. 1 and 2)

Importantly, although plaintiffs state in their March 20, 2014 affidavits that they learned the specific identities of the officers who struck them while attending the officers' depositions in October 2013, plaintiffs did not seek to supplement or amend their earlier responses.  In fact, Park's and Rojas's depositions were taken on October 9, 2013, just a couple days after the responses to defendants' interrogatories were emailed.  Fed.R.Civ.P. 26(e) states that a party who has responded to an interrogatory must supplement or correct his response "in a timely manner if the party learns that in some material respect the... response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Clearly, the identity of Officers Park and Rojas as the defendants who inflicted excessive force is material to the case.  Had plaintiffs realized on October 9, 2013 that it was Park and Rojas that struck them, they were obligated to correct their discovery responses.  This information would have put defendants on notice of which officers plaintiffs were alleging committed excessive force. Instead, plaintiffs chose to wait five months before revealing the officers' identities.

It is also curious that plaintiffs did not seek to amend their Complaint in October 2013 when they finally ascertained the identity of Park and Rojas given that an ongoing problem in

15

this case has been that plaintiffs have been unable to identify which police officers struck them.

Because the averments as to Park and Rojas have been stricken, plaintiffs have not presented evidence of excessive force by any specific officer. Additionally, plaintiffs are apparently abandoning claims against the other officers based on excessive force. Summary judgment is warranted on this claim.

**(b) Violation of Privacy (Count Two)**

Substantive due process guaranteed by the Fourteenth Amendment protects two types of privacy rights, one of which protects an individual's interest in avoiding disclosure of personal matters. *Bailey v. City of Port Huron,* 507 F.3d 364 (6th Cir. 2007) (citations omitted). Plaintiffs do not address this claim. Even so, they admit that nobody from the neighborhood has indicated that they saw any part of the events of April 8th. (Ondo depo. 9)

Summary judgment is warranted on this claim.

**(3) Failure to Intervene (Count Three)**

To prevail on this claim, plaintiffs must present evidence that defendants "observed or had reason to know that excessive force would be or was being used" and "had both the opportunity and the means to prevent the harm from occurring." *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013).

Plaintiffs have not specifically identified which officers failed to intervene. In fact, plaintiffs state in their brief:

> [Plaintiffs] testified that a number of the Defendants were present when Defendant Officers Park and Rojas assaulted them in the vacant second floor apartment as they faced the wall. They also testified that turning their heads, the only manner by which they could ascertain who may have been present during their assault, only resulted in

16

>further assaults. This, coupled with the fact that determining which Defendants were present while Plaintiffs were assaulted is an issue of fact...

(Doc. 79 at 23). At most, Simcox's affidavit avers that Crytzer "was laughing while all of this was happening." However, the averment cannot be considered for the same reason discussed earlier that the Court cannot determine whether this statement is based on personal knowledge or whether it is based on belief.

Summary judgment is warranted on this claim.

### (d) Equal Protection (Count Four)

Plaintiffs contend that defendants violated the Equal Protection Clause by intentionally forcing them to remain in their underwear when they were arrested, transported, and delivered to the Cleveland City jail because of their sexual orientation. Defendants are entitled to summary judgment on this claim.

Plaintiffs acknowledge that the Sixth Circuit has not identified sexual orientation as a suspect class. Plaintiffs assert that even so, Officer Johnson's treatment of plaintiffs violated equal protection because it was motivated by animus and/or ill will. Plaintiffs point to Johnson's statement that "faggots don't wear pants to jail." Assuming Johnson made this statement, this Court finds that homophobic slurs do not amount to a constitutional violation. *See Williams v. Sandel*, 433 Fed.Appx. 353 (6th Cir. 2011) (collecting cases stating that officers' use of verbal threats, racial epithets, or slurs do not transform a claim into one for excessive force) and *Goings v. Chicksaw Cty.,* 2008 WL 686917 (N.D.Iowa 2008) (citing *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir.1985)) ("The court does not consider, on an independent basis, Plaintiff's allegation that one of the officers called him a 'faggot.' No matter how reprehensible, 'name calling is not a constitutional violation.' ")

Additionally, plaintiffs fail to point to a clearly established right not to be taken to jail dressed as they were.  Moreover, plaintiffs cannot dispute the deposition testimony of non-defendants Lieutenant Gaertner and Sgt. Galamarini that they were in command of the officers that day, they made the decision to transport plaintiffs as they were, and their decision was not based on illegal animus.  Gaertner stated that plaintiffs were "agitated and upset" and he "just wanted to get them out of there, have them go to jail."  Although he could not recall that they requested pants, he would not have allowed it because he did not want them interacting with anyone else, he was not going to "unhandcuff" them, and "you don't know what's in" the pants.  (Gaertner depo. 56-58) Similarly, Galamarini testified that had plaintiffs asked for pants, he would have handed them over to prisoner personnel as they were given their agitated state.  He also stated that he knew at the time that plaintiffs were being arrested for assaulting a police officer and he would not have taken the chance on "uncuffing" them. (Galamarini depo. 33-34)

Summary judgment is warranted on this claim.

**(2) State Law Claims**

**(a) Intentional Infliction of Emotional Distress**

It is well-settled under Ohio law that one who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, one is liable for such bodily harm. To reach the requisite level of "extreme and outrageous," the conduct must "go beyond all possible bounds of decency, such as to be regarded as atrocious and utterly intolerable in a civilized community." It must be a case in which "the recitation of the facts to

18

an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Yeager v. Local Union* 20, 6 Ohio St.3d 369 (1983).

Defendants assert that the officers are entitled to statutory immunity.  Plaintiffs contend that an exception to immunity applies. Ohio provides statutory immunity against civil liability to government employees unless, *inter alia,* the employee's acts were with malicious purpose, in bad faith, or in a wanton or reckless manner.  Ohio Rev.Code § 2744.03(A)(6).

Plaintiffs assert that the actions of Park and Rojas were outrageous and fall within this exception to immunity.  But, the Court has already determined that it cannot consider the evidence against these two officers in particular.

Plaintiffs also assert that defendants openly mocked them in plaintiffs' own front yard based on their sexual orientation, and they subjected them to ridicule in the transport vehicle because they were forced to wear only their underwear.  The Court cannot find that the evidence is sufficient to withstand summary judgment in defendants' favor as to statutory immunity.  Plaintiffs do not identify which particular officers made the comments on the front yard.  Additionally, plaintiffs testified that no one heard the officers' words while they were outside.  And, Ondo testified that the officers were speaking among themselves and not to them. Simcox repeated a comment that an officer made that plaintiffs' actions were "gross." Again, the identity of the officer is not revealed. Also, this comment would be insufficient to amount to outrageous conduct.  As for plaintiffs being forced to be transported in their underwear, as discussed herein, the commanding officers (who are not defendants) made the decision to transport plaintiffs in their underwear based on safety reasons.

Summary judgment is warranted on this claim.

19

### (b) Invasion of Privacy (Count Six)

Plaintiffs do not address this claim. Under Ohio law, invasion of privacy "involves the public disclosure of private facts, a required element of which is publicity. Publicity requires a communication to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Morgan v. Community Health Partners*, 2013 WL 2407123 (Ohio App. 9th Dist. June 03, 2013) (citing *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App.3d at 166, 499 N.E.2d 1291 (10th Dist.1985) (internal quotations and other citations omitted).

As stated above, there is no evidence that anyone heard any of the alleged remarks made by defendants on plaintiffs' front lawn. In the absence of a public disclosure and communication to the public at large, defendants are entitled to summary judgment on this claim.

### Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment and defendants' Motion to Strike the Affidavits of Plaintiffs Steven Ondo and Jonathon Simcox are granted.

IT IS SO ORDERED.

        /s/ Patricia A. Gaughan
        PATRICIA A. GAUGHAN
        United States District Judge

Dated: 4/28/14